UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-208 (ECT/ECW)

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

DIVAUNTE KARTRELL YOUNG,

        Defendant.

**GOVERNMENT'S POSITION
REGARDING SENTENCING**

Divaunte Kartrell Young is now before this Court because a jury of his peers found him guilty of felon in possession of a firearm. Young's crime alone is—of course—worthy of a significant, punitive sentence. However, given the aggravated context in which Young's illegal possession was discovered, as well as his efforts at obstructing justice in this case, the Court should sentence Young to 180 months imprisonment and three years of supervised release. While the Government recognizes such a sentence is the statutory maximum for Young's conviction, it is appropriate given the breadth of his criminal conduct here, his extensive criminal history, and his pretrial misconduct. Moreover, considering the relevant sentencing factors set forth in 18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary.

## I.    **Offense Conduct.**

The Government believes that the offense conduct is adequately described in the PSR. PSR ¶¶ 5-11.

## II.   <u>Sentencing Guidelines Range and Defendant's Objections.</u>

On March 26, 2025, following a three-day jury trial, Young was found guilty of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). The PSR's Guidelines range calculation is disputed by defense. The parties agree that the base offense level for Young's crime of conviction is 24. PSR ¶ 18. The defense disputes the four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B) (possession in connection with another felony offense), as well as a two-level upward adjustment pursuant to U.S.S.G. § 3C1.1 (obstruction of justice).[1] Both should be applied here.

Under U.S.S.G. § 2K2.1(b)(6)(B), a defendant is subject to a four-level enhancement if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." This section applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." U.S.S.G. § 2K2.1(b)(6)(B), cmt. n.14(A). The enhancement may apply "regardless of whether a criminal charge was brought, or a conviction obtained" for the other felony. *Id.* at cmt. n.14(C). "[I]n connection with" means at a minimum, the presence of the firearm had the potential to facilitate the

---

[1] The defense has also objected to the PSR's assignment of criminal history points for two of Young's juvenile convictions. *See* PSR Addendum A.2. (ECF No. 150-1). While the Government contends these convictions should be counted towards Young's criminal history, the application is largely academic. With or without the criminal history points, Young's criminal history category—due to his overwhelming penchant for violent criminal behavior—remains at VI.

offense, as opposed to being the result of mere accident or coincidence. *United States v. Harper*, 466 F.3d 634, 650 (8th Cir. 2006) (quoting *United States v. Regan*, 125 F.3d 685, 686 (8th Cir. 1997). Based on the facts and evidence—of which the Court undoubtedly remembers from trial—there are two felonies the Court could find Young committed, by a preponderance of the evidence, during the course of his possession of his firearm: (1) second degree assault; and (2) terroristic threats.

Under Minnesota law, a person commits assault in the second degree where he "assaults another with a dangerous weapon," Minn. Stat. § 609.22, an assault including "an act done with intent to cause fear in another of immediate bodily harm or death," Minn. Stat. 609.01, subd.10(1). Minnesota courts have affirmed guilty verdicts for this crime where the defendant displayed or brandished a weapon in a threatening manner, even if the defendant did not point or swing the weapon toward the victim. *See State v. Taylor*, No. A19-0042, 2019 WL 7049564, at *3 (Minn. Ct. App. Dec. 23, 2019) ("While Taylor never took the gun out of his pocket, it is reasonable to infer that when a person approaches another while yelling, with his hand inside his coat apparently holding a gun with his finger near the trigger, that person intends to cause the other person fear" given the "threat that, at any moment, Taylor could take out the gun and shoot D.S."); *State v. Patton*, 414 N.W.2d 572, 573 (Minn. Ct. App. 1987) (defendant was yelling, went into "an attack

position, " and "twice approached [victim] with the knife in his hand" but did "not swing the knife . . . or attempt to stab them").

The crime of "threats of violence" (formerly called "terroristic threats") is committed when a defendant "threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1. The Minnesota Supreme Court has held that "*physical acts which communicate a threat*, as well as oral and written threats, fall within the ambit of" this crime. *State v. Murphy*, 545 N.W.2d 909, 916 (Minn. 1996) (emphasis added); *cf. State v. Fields*, No. A23-0400, 2024 WL 911978, at *4 (Minn. Ct. App. Mar. 4, 2024) (in first degree robbery prosecution, finding evidence established threat of imminent force when defendant pushed a shopping cart toward victim, refused to comply with requests, pulled out pocket knife, and began to unfold it).

As this Court recalls, on March 18, 2023, Young and the victim, a relatively new acquaintance, were driving around in the victim's car throughout the day. The victim picked Young up from his child's mother's house, drove him to a bank to cash a check, shopped at the Apache Mall where he bought an Adidas crossbody bag, and then had a meal at Wildwood Sports Bar and Grill. It was in one of the mall's parking lots that Young first showed the victim his gun.

After a long day, and as day turned into night, the victim wanted to drop Young off somewhere and go home. As they sat in a Holiday gas station parking lot, Young explained that he wanted the victim to drive him from Rochester to the Twin Cities, which would be a four-plus hour roundtrip for the victim. The victim declined, so Young offered to pay her. She declined again. As she relived her fear, the victim related that when she refused to drive Young to the Twin Cities, he unzipped his new Adidas crossbody bag, showed her his firearm and made statements about what he could do to her or the car with the gun if she did not do what he said.[2] Young's words, and the sight of his gun, unraveled the victim. She left her car and hid in the gas station's bathroom for almost an hour. She called and described her situation to her friends while Young repeatedly called her, heightening her sense of fear.

Close to midnight, feeling that she had no choice, she eventually left the gas station's bathroom, drove with Young in her car for a few more blocks, parked her car in the middle of a residential neighborhood, and then fled from her car, taking only her keys and purse. The victim explained that, as she

---

[2]    In Gov't Ex. 19 (2:02 to 2:42), when asked what happened by Rochester Police Department Officer Jack Peterson, the victim explained, "So he didn't, he didn't point it at me. He basically…he made a joke. He said it was a joke. He looked at me and he said 'what if I, what if I shot your brain'…it was like something about like shooting me in the car. And then he was like 'ahhh, I'm just playing.' He was trying to downplay it, but it scared the shit out of me."

walked around in the below freezing mid-March temperatures, she began hyperventilating and ultimately vomited on the ground.

These facts unquestionably support the conclusion that Young committed one or both of these felonies. Young's actions have only one logical interpretation: take me to the Twin Cities, or I'll use this gun. The victim certainly interpreted Young's words and actions that way, and her interpretation was entirely reasonable under the circumstances. This Court can and should find, by a preponderance of the evidence, that Young committed the felony crimes of second-degree assault and/or terroristic threats in connection with possessing the charged firearm. He is therefore subject to the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B).

Under U.S.S.G. § 3C1.1, a defendant is subject to a two-level upward adjustment if the "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and…the obstructive conduct related to…the defendant's offense of conviction and any relevant conduct[.]" Here, Young's statements to the victim in recorded jail calls are easily identifiable as obstructive conduct. *See* PSR ¶¶ 10-11. In his calls, Young requests the victim to lie to police and the court about the facts of the case so that he can escape accountability. When it became

evident that the victim was not going to perjure herself, Young attempted to sweeten his request by offering her money.

Young's conduct falls squarely within the confines of the Guidelines. As outlined in the application notes, covered conduct includes "threatening, intimidating, or otherwise unlawfully influencing a…witness…directly or indirectly, or attempting to do so," as well as "committing, suborning, or attempting to suborn perjury[.]" U.S.S.G. § 3C1.1, comment. (n.4)(A-B)). Young is therefore subject to the two-level upward adjustment.

Should the Court agree with the PSR's (and the Government's) Guidelines calculations, with a criminal history category of VI, Young's advisory Guidelines range is 168-210 months' imprisonment. Because the statutory maximum for Young's offense of conviction is 180 months, Young's advisory Guidelines range becomes 168-180 months' imprisonment.

## III.  **The Appropriate Sentence.**

The Guidelines range is the start, and not the end, of the analysis. *See e.g., United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors"). The Government has

considered the applicable 3553(a) sentencing factors and provides the following as reasons for the Court to adopt the recommendations herein.

The Government recognizes that its 180-month sentence is the statutory maximum. However, the recommended 180-month sentence seeks to balance a number of 3553(a), which, in the Government's estimation, calls for a higher sentence allowable by law. In other words, 180-months' imprisonment, though lengthy, is necessary given the circumstances. The nature and circumstances of Young's crime is an aggravating factor here. Young, a convicted felon many times over, possessed a loaded firearm, and threatened his acquaintance with it when she did not do what he demanded. Not only was the victim in this case undeserving of Young's violent acts and uninvolved in Young's criminal activities, but she had kindly chauffeured Young around the entire day only to mete his ire at the first moment she refused his requests. Ultimately, no one was injured, but Young's willingness to threaten others with a loaded gun indicates that his possession of firearms isn't just for show.

This is not Young's first conviction involving a measure of violent behavior. Indeed, Young's criminal history goes back to when he was 12 years old. Rather than participating in age-appropriate behaviors, Young was frequently arrested or charged with *eight* assaults, one robbery, a case involving threats of violence, and other miscellaneous crimes, all before he

turned 18.[3] PSR ¶¶ 30-47. Even before he reached the age of majority, now firmly entrenched in a life of criminal behavior, Young's actions escalated exponentially when he was 17. In 2018, Young was arrested for two cases of first degree burglary involving dangerous weapons or explosives. PSR ¶¶ 48-49. In one case, it was alleged that there was an illegal possession of two firearms (though those counts were ultimately dismissed in a plea deal); in the other, Young pinned his mother against a car and strangled her. *Id.* Even adult convictions and criminal supervision failed to stymie Young's want to commit violence. In 2019, he strangled his mother again. PSR ¶ 50. Later that year, he robbed an individual. PSR ¶ 51. Still later that year, Young assaulted a corrections officer multiple times before having to be tased. PSR ¶ 52.

These convictions and sanctions did nothing to dissuade Young from a life of crime and violence. Particularly aggravating to Young's crime here is that he was on supervision for four cases. In those four cases, as the PSR notes, Young was ultimately sentenced to prison and supervision. On February 27, 2023, Young was released from prison to start supervision. *See* PSR ¶¶48-52. By March 14, 2023, Young had absconded from supervision. *Id.* Four days later, Young committed the actions that have brought him before this Court.

---

[3]    Many of Young's juvenile convictions/adjudications do not count towards his criminal history category. While Young's criminal history category is already at VI (after obtaining 19 points), the Government suggests that the 19 points amassed substantially underrepresents the seriousness of his criminal history (U.S.S.G. § 4A1.3(a)(1)).

Young's extended criminal history further demonstrates that, not only has the criminal punishment he has received over the many years failed to deter him from future misconduct, but he is a grave risk to public safety. The Court need not look just to Young's past criminal conduct to know that Young presents a substantial risk if released back into the community. While Young has been subject to pretrial detention in this case, he not only has been subject to disciplinary actions outlined on **233** pages of reports, but has also amassed *five* new charges, four of which are assaults. PSR ¶¶ 59-64. In April 2024, Young threw his urine on two correctional officers. PSR ¶ 59. Nine days later, and after refusing to follow orders, he bit an officer's leg. PSR ¶ 60. In June 2024, after refusing orders again, Young punched one correctional officer several times in the head, and spit in another officer's face. PSR ¶ 61. Ten days later, Young destroyed a video kiosk and then spit in another officer's face. PSR ¶ 62. All of his conduct makes it exceedingly clear that a lengthy period of imprisonment is warranted to not only (hopefully) deter Young from future acts of violence, but to also further protect the community from his recidivism.

Additionally, it is also both an understatement and—unfortunately—stated all too often that we live in a society where gun violence is the norm. The communities in our District have been inundated with gun violence for several years now. The reasons for this precipitous rise and maintained normalcy are, of course, multifactorial. To be clear, Young's actions contributed

to but are not the reason for our District's gun violence issues. However, Young's crimes in the current context cannot be ignored. As evidenced in this case, firearms are in a unique position to instantly and tragically shatter lives. Each projectile has the ability to injure, maim, or kill, which has lasting impacts on households, families, and communities. Two years removed from the crime, this Court heard and saw the victim's emotions during her testimony. Young's actions will likely affect her mental and emotional health for the rest of her life.

Standing alone, this Court should not tolerate Young's crimes here. Given the District's struggles with gun violence, the protection of the community against those who illegally possess firearms creates a renewed urgency to appropriately punish those who illegally possess firearms, and who use those firearms to injure others in the furtherance of their criminality. A sentence of 180 months' imprisonment creates the possibility of specifically deterring Young from resorting to similar habits when he is released from custody. Such a sentence also sends a message to the public that reflects the seriousness of the offense, promotes respect for the law, and is a stand against the continued illegal possession of firearms.

The Government's recommendation has considered Young's family history and personal characteristics, which provide mitigation for the Court to consider. *See e.g.,* PSR ¶¶ 67, 69-72, 77-82, 85-87. However, on this record, the

aggravating circumstances of Young's history, crime, and current circumstance substantially outweigh any mitigation his family history suggests. Additionally, given the Guidelines range (absent the statutory maximum), such mitigation would suggest a sentence within the upper-Guideline range, rather than a potential for an upward departure.

The Government recommends the Court sentence Young to three years of supervised release in order to fully maximize supervised release as a tool to decrease Young's chances of recidivism, bolster his opportunities for success, and to protect the community. Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty," *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

To the point, Young's criminal conduct here, as well as his poor history on supervision, speaks towards a need for the maximum length of supervised release period. The need for a smooth transition from prison to society is paramount to further protect the community and for Young's rehabilitation. The Government's recommendation of three years' supervised release provides

an adequate amount of time for such a transition, and the structured environment provided by U.S. Probation has the ability to decrease Young's chances of recidivism. In the absence of any lasting behavioral changes, supervision can adequately inform the Court and potentially provide further public protection. As conditions for supervised release, the Government is supportive of conditions outlined in the PSR. PSR ¶¶ 121-127. In addition, the Government is supportive of Re-Entry Court, should Young qualify, as well as any other condition the Court deems appropriate.

## <u>CONCLUSION</u>

All told, Young's crimes are significant, and have affected the wellbeing of an innocent victim. For his actions, the Government recommends he serve 180 months' imprisonment, followed by three years' supervised release. This sentence adequately accounts for Young's criminal conduct, but also accomplishes federal sentencing goals of being sufficient, but not greater than necessary.

Dated: August 22, 2025

Respectfully Submitted,

JOSEPH H. THOMPSON
Acting United States Attorney

/s/ *Evan B. Gilead*

BY: EVAN B. GILEAD
Assistant United States Attorney

13